CARIBE LUMBER & TRADING CORPORATION, demandante y recurrente, *v.* INTER–AMERICAN BUILDERS, INC. y AMERICAN SURETY CO. OF NEW YORK, demandadas y recurridas.

*Numero:* R-72-118          *Resuelto:* 25 de mayo de 1973

*Sweeting, González & Ruiz,* abogados de la recurrente; *A. Castro Fernández* y *F. Castro Amy,* abogados de las recurridas.

EL JUEZ ASOCIADO SEÑOR CADILLA GINORIO emitió la opinión del Tribunal.

La Asociación de Maestros de Puerto Rico otorgó un contrato a la corporación Southern Builders, Inc., para la construcción de un edificio en Hato Rey, Puerto Rico. Esta, a su vez, otorgó un subcontrato con la corporación codemandada Inter-American Builders, Inc., como subcontratista, para la construcción por ésta, de dicha obra. Como una obligación bajo el subcontrato, la codemandada Inter-American Builders, Inc., como *principal* y la codemandada American Surety Company of New York, como *fiadora* (*"surety"*), expidieron una fianza de pago a favor del contratista principal Southern Builders, Inc., como *beneficiario* (*"obligee"*) y para el uso y beneficio de las personas con contratos directos con dicha Inter-American Builders, Inc., para suplir materiales y/o mano de obra para usarse en dicha obra. (*Subcontract Labor and Material Payment Bond*).

Dicha fianza contiene la cláusula 3(a) que dispone:

"(3) No podrá persona alguna iniciar pleito o acción bajo la presente:

(a) A menos que previamente haya notificado por escrito a cualesquiera dos de las siguientes:

A la principal (Inter-American Builders, Inc.);

A la acreedora (Southern Builders, Inc.); o a la fiadora (American Surety Company of New York), *dentro de los NOVENTA (90) días* siguientes a la fecha en que el reclamante realizó el último trabajo o suplió los últimos materiales objeto de su reclamación." (Énfasis nuestro.)

La demandante Caribe Lumber & Trading Corporation instó acción reclamando dos partidas, pero este recurso se limita a la acción seguida contra la fiadora American Surety Company of New York en reclamación de $18,327.24 por concepto de mano de obra y materiales suplidos por dicha

demandante a la subcontratista constructora de la obra Inter-American Builders, Inc.

De la estipulación de hechos sometida ante el tribunal sentenciador de fecha 24 de abril de 1962 surge que la demandante Caribe Lumber Trading Corporation, suplidora de los referidos servicios y materiales, antes de iniciar su acción judicial, notificó de su reclamación a la subcontratista constructora Inter-American Builders, Inc., dentro del plazo de noventa (90) días fijado en la cláusula 3(a) arriba referida; *nunca notificó* a la acreedora (*obligee*) Southern Builders, Inc.; y a la fiadora American Surety Company of New York le remitió notificación el 21 de marzo de 1961, con un retraso de nueve (9) días después de haber expirado los noventa (90) días del término dentro del cual venía obligada a notificar por escrito a cualesquiera dos de las tres entidades mencionadas en la cláusula 3(a), *supra;* a partir de la fecha en que había suplido los últimos materiales o servicios, que se estipuló fue el 12 de diciembre de 1960.

La fiadora levantó como única defensa, en oposición a la reclamación, ante el tribunal de instancia, la referida tardanza en la notificación; y dicho tribunal (Hon. Francisco Espinosa Robledo, Juez) dictó sentencia desestimando la demanda contra la fiadora. Acordamos revisar dicha sentencia.

La recurrente Caribe Lumber & Trading Corporation señala, como cometidos por el tribunal de instancia, cuatro errores: (1) al no aplicar la doctrina a los efectos de que una fianza para beneficio de suplidores de materiales o mano de obra debe ser interpretada liberalmente a favor de ellos; (2) al no aplicar la doctrina de que una fianza es de la naturaleza de un contrato de seguro, por lo cual le son aplicables las reglas que gobiernan la interpretación y aplicación de los contratos de seguro; (3) porque una notificación tardía, por sí sola, no es suficiente para liberar a una compañía aseguradora de responsabilidad; y que para que el incumpli-

miento de la obligación de notificación por escrito releve a la aseguradora de responsabilidad, es necesario que ésta demuestre que tal incumplimiento le causó daños sustanciales; y (4) porque una tardanza en notificar releva a la compañía fiadora de su responsabilidad bajo la fianza, únicamente hasta las pérdidas que ésta haya incurrido debido a dicha tardanza; pero no la releva totalmente.

(1) Para sostener su alegado primer error, invoca la recurrente el caso de Goss v. *Structural Concrete Products*, 92 D.P.R. 391 396 (Dávila) (1965). Es cierto que en ese caso dijimos que la regla de interpretación estricta de las fianzas de compañías fiadoras había sido abandonada por una de *interpretación liberal*, siguiendo a *Cristy & Sánchez* v. *E.L.A.*, 84 D.P.R. 234 (Belaval) (1961) (obra pública); *A. L. Arsuaga, Inc.* v. *La Hood Const., Inc.*, 90 D.P.R. 104 (Dávila) (1964) (obra privada); *Ulpiano Casal, Inc.* v. *Totty Mfg. Corp.*, 90 D.P.R. 739 (Ramírez Bages) (1964) (obra pública); *Jiménez y Salellas, Inc.* v. *Maryland Cas. Co.*, 92 D.P.R. 207 (Rigau) (1965) (obra pública); pero la decisión en ese caso de Goss, supra, presenta una situación de hechos diferente a la del presente caso. Es cierto que allí se dijo que la regla de interpretación *estricta* había sido abandonada por una de interpretación liberal, pero la decisión en ese caso no fue en el sentido de aplicar una interprétación liberal para ignorar la disposición de una cláusula de una fianza fijando un término específico para hacer una notificación escrita. Allí, como en el presente caso, se trataba de una fianza expedida por Maryland Casualty Co., como fiadora, obligándose con la corporación "Structural" a pagarle a todos los que sirvieran materiales o prestaran servicios para realizar el trabajo contratado por "Structural", de concreto prefabricado requerido en la construcción del "Hotel Miramar Charterhouse", y para realizar el cual "Structural" obtuvo, como arrendataria, una grúa de Goss y quedó a deber el importe del alquiler de la grúa, así como el costo de la trans-

portación de la misma. Goss instó acción en cobro de esas sumas contra "Structural" y la fiadora "Maryland" y esta última levantó la defensa de que la fianza no cubría esa reclamación. Tanto el Tribunal de Distrito como el Tribunal Superior sostuvieron que sí la cubría. Este último sostuvo que dada la naturaleza de la obra, el equipo pesado era necesario para cumplir con los términos del contrato y se usó para tal fin; y consideró el uso de la grúa como parte de la mano de obra (*labor*) a que se refiere la fianza.

En revisión, este Tribunal aplicó la doctrina de la interpretación liberal, o inclusiva de las fianzas, pero en un sentido *inclusivo*, resolviendo que el arrendamiento de la grúa estaba incluído en la obligación asumida por la fiadora de pagarle a todo aquel que hubiera suministrado materiales o rendido trabajo en la realización de la obra; ya que, en vez de ocupar obreros para llevar a cabo cierta parte del trabajo, se utilizó la grúa que facilitó la realización de la obra y contribuyó a reducir el monto de la partida de mano de obra. Este Tribunal consideró el arrendamiento de la grúa como mano de obra, pero expresó que considérese ya como materiales, como se hizo, en *Illinois Surety* v. *John Davis Co.*, 244 U.S. 376 (1917), o como mano de obra, siempre estaba cubierto por la fianza, y confirmó la sentencia del Tribunal Superior. Los hechos, pues, de ese caso son distintos a los del presente en el que lo que está envuelto es la interpretación de la cláusula sobre notificación por escrito dentro del término de noventa días.

Igual situación existía en los casos de *Cristy & Sánchez*, *A. L. Arsuaga, Inc.* y *Ulpiano Casal, Inc.*, supra. Los hechos envueltos en dichos casos eran diferentes. En ninguno estaba envuelta la interpretación de una cláusula de las fianzas relacionada con la notificación por escrito, dentro de un término específicamente fijado en el contrato; y en el de *Jiménez y Salellas*, supra, lo que estaba envuelto era si el término de

seis meses que concede la ley(¹) para establecer la acción judicial, a partir de aceptada finalmente la obra, es uno de prescripción o de caducidad. Este Tribunal resolvió que era uno de caducidad. No estaba envuelta la cuestión de la notificación por escrito dentro de un término específico.

(2) Argumenta la recurrente su segundo error alegando que la fianza es de la naturaleza de un contrato de seguro por lo cual debe aplicárseles las reglas que gobiernan la interpretación y aplicación de los contratos de seguro.

El contrato de seguro aparecía en el Título XII, Capítulo II del Código Civil de Puerto Rico, ed. 1930, pág. 353, Art. 1691, comprendido entre los Contratos Aleatorios o de Suerte, conjuntamente con el juego y la apuesta y en dicho Art. 1691 se le definía así:

"Contrato de seguro es aquel por el cual el asegurador responde del daño fortuito que sobrevenga en los bienes muebles o inmuebles asegurados, mediante cierto precio, el cual puede ser fijado libremente por las partes."

En esa edición de 1930, el contrato de seguro estaba cubierto por los Arts. del 1691 al 1697, ambos inclusives (secs. 4751 a 4757, ambas inclusives, del Título 31 de L.P.R.A. derogados).

El contrato de fianza también aparecía en la referida edición del Código Civil de Puerto Rico del año 1930, pero como una figura jurídica independiente, en el Título XIV, Capítulo I, pág. 356. Esos artículos de la edición de 1930 del Código Civil de Puerto Rico fueron derogados por la Ley Núm. 77 del 19 de junio de 1957, pág. 183, efectiva el 1ro. de enero de 1958, por la que se creó el Código de Seguros de Puerto Rico, que se encuentra en 26 L.P.R.A. sec. 101 *et seq.;* y en cuyo Art. 1.020 (26 L.P.R.A. sec. 102) se define el contrato de seguro así:

"102. Seguro, definición.

---

(¹) Art. 9, Ley Núm. 388 de 9 de mayo de 1951 (22 L.P.R.A. sec. 55).

Seguro es el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo."

Al pasar a ser parte del Código de Seguros de Puerto Rico, las secs. 4751 a 4757 del Título 31 de L.P.R.A., y que procedían de los Arts. 1691 a 1697 de la ed. de 1930 del Código Civil de Puerto Rico, quedaron derogados y por eso no aparecen en dicho Título 31, *supra*.

■ Nótese que el contrato de *fianza*, por no ser un contrato de seguro, no se incorporó al Código de Seguros, y permaneció cubierto por el Código Civil de Puerto Rico, como figura jurídica independiente y separada del contrato de seguro, tanto en la ed. de 1930 de dicho Código (Arts. 1721 *et seq.*), como en 31 L.P.R.A. secs. 4871 *et seq.*, donde se define dicho contrato de fianza como sigue:

"Sec. 4871. Fianza, definición de:

Por la fianza se obliga uno a pagar o cumplir por un tercero, en el caso de no hacerlo éste.

Si el fiador se obligare solidariamente con el deudor principal se observará lo dispuesto en el subcapítulo IV, Capítulo 245, de este título."

■ Por eso, ya desde el año 1944, resolvimos en *Colón* v. *P.R. & Amer. Insurance Co.*, 63 D.P.R. 344 (Travieso) que:

"Un *surety bond* es una fianza por escrito y ante notario. El que una compañía de seguros la preste no varía su naturaleza de fianza.

Siendo el *surety bond* un contrato de fianza se rige por las disposiciones del Código Civil sobre fianzas *y no por la Ley de Seguros.*" (Énfasis suplido.)

■ Es conveniente señalar aquí las diferencias entre el contrato de seguros y el de fianza para la mejor inteligencia de las implicaciones de lo que más adelante expresamos. El tratadista G. W. Crist, Jr., dice que establecer la diferencia entre ambos contratos es tan difícil como comparar "un

poema y una perla", y que, sin embargo, la mayoría de las gentes tienen la impresión de que tiene algo que ver con los seguros.

Un autor sostiene que el negocio de prestar fianzas es, quizás, la segunda más antigua de las profesiones.

En la antiguedad se miraba con desconfianza el convertirse en fiador de otra persona. En el Templo de Delfos, en la antigua Grecia, había una inscripción atribuída al sabio filósofo griego Tales, que leía: "la fianza es la precursora de la ruína." Iguales advertencias encontramos en la Sagrada Biblia. Nueve siglos antes de la era Cristiana, el sabio Rey Salomón advirtió a los ciudadanos de Israel: "Hijos míos, si salieres fiador por tu amigo, si tocaste tu mano por el extraño, enlazado eres con las palabras de tu boca y preso con las razones de boca; haz ésto ahora, hijo mío, y líbrate, ya que has caído en las manos de tu prójimo. . . ." (2) Y dijo además: "Con ansiedad será afligido el que fiara al extraño; más el que aborreciere las fianzas vivirá confiado". (3) "El hombre falto de entendimiento toca la mano, fiando a otro delante de su amigo." (4) Finalmente advirtió: "Quítale su ropa al que salió por fiador del extraño; y tómale prenda al que fía la extraña." (5) En los tiempos modernos, se expresa el mismo concepto diciendo que uno ha perdido hasta la camisa por asumir ese riesgo.

No obstante esa animosidad contra la fianza, su importancia y necesidad fue aumentando según la civilización progresaba, y hoy día se ha convertido en una tremenda industria, un gigante de los negocios mundiales, sobre todo en los Estados Unidos de Norteamérica y en Inglaterra.

En cuanto a su naturaleza, el contrato de fianza tiene tres características determinantes de la razón de su especialidad.

---

(2) Proverbios: 6:-1-2.
(3) Proverbios: 11:-15.
(4) Proverbios: 16-18.
(5) Proverbios: 20-16.

En primer lugar, la obligación contraída por la fianza es *accesoria* y *subsidiaria*, porque no tendría objeto si no existiera otra obligación principal cuyo cumplimiento asegure y garantice, hasta el extremo que sin ésta no se concibe la existencia de la fianza. No es una obligación principal e independiente y con vida propia, porque surge a la vida jurídica cuando exista la obligación principal que garantiza; y es subsidiaria y condicional porque su valor efectivo no surge hasta que se cumpla la condición o se realice el hecho futuro e incierto de dejar de satisfacer su débito el principal obligado en la forma y en el tiempo en que se comprometió a hacerlo. Se considera a la fianza como una "verdadera promesa", porque el fiador es extraño a la obligación contraída por el deudor con relación al acreedor e interviene en la relación jurídica entre éstos, únicamente al solo objeto de garantizar su cumplimiento. En segundo lugar, es *unilateral* porque puede establecerse sin intervención del deudor, y aún del acreedor en cuyo favor se constituye; y porque de la fianza se derivan obligaciones por parte del fiador con relación al acreedor, aunque su cumplimiento o consumación da origen a obligaciones del fiado respecto del fiador; y tercera, que el fiador es persona distinta del fiado, porque nadie puede ser fiador personalmente de sí mismo. No ocurre ésto en las garantías reales, como la prenda y la hipoteca, en las cuales el mismo deudor grava sus bienes propios, muebles e inmuebles, para garantizar el pago de su deuda. Manresa, *Código Civil Español*, Tomo 12, págs. 158 *et seq.*, 5ta ed., Instituto Editorial Reus, Madrid, 1951. Castán Tobeñas, *Derecho Civil Español, Común y Foral*, Tomo IV, 9a. ed., Instituto Editorial Reus, Madrid, 1961, págs. 685 *et seq.*

En cuanto al contrato de seguro, su carácter es bilateral, porque son mutuos y correlativos los derechos y deberes establecidos entre una compañía aseguradora y el asegurado, por proceder de una misma causa.

En el caso del seguro, bien fuere fuego, vida, accidente,

o el que sea, los aseguradores asumen todo el riesgo, lo que supone el cobro de una prima adecuada al riesgo envuelto. La teoría básica de la fianza, sin embargo, presupone que el fiador no asume gran riesgo, y que las primas recibidas son meramente cargos por servicios rendidos al prestar su crédito. En el contrato de seguro hay dos partes—el asegurador y el asegurado. Si el asegurado sufre una pérdida cubierta por el contrato, el asegurador le paga. En el contrato de fianza, por otro lado, hay tres interesados. El deudor en la transacción objeto de la fianza es el *principal*. Es éste el que promete al beneficiario de la fianza, o sea, al *obligado*, qué hará o se abstendrá de hacer, una cosa cierta. El *fiador*, quien es la otra parte, dice en efecto que si el principal no cumple, el fiador cumplirá, o en su defecto, restituirá al obligado cualesquiera daños que éste sufriera, o que habrá de pagarle determinada suma como penalidad.

Los ingresos por concepto de primas son igualmente importantes para las compañías de seguro y las de fianza, aunque dichas primas cumplen funciones distintas. En el seguro, el ingreso por concepto de primas es el único fondo del cual se pagan las pérdidas. Dicho ingreso debe ser suficiente para satisfacer las pérdidas resultantes de riesgos de naturaleza similar. Las pérdidas que surgen del seguro ocurren y son descubiertas casi concurrentemente con el término del contrato de seguro. De suerte que puede predecirse con prontitud la proporción de las pérdidas y por ende puede establecerse un tipo adecuado del riesgo de exposición. Puede decirse pues que el negocio de seguros es casi una ciencia exacta.

Los ingresos de primas de las compañías de fianza tienen que ser también adecuados para la distribución de pérdidas, pero las pérdidas en las fianzas son de lenta incubación. Los tipos deben fijarse en un intento de establecer un ingreso de primas que permitan la distribución de pérdidas a través de un ciclo largo e indeterminado que comprende años gananciosos y años no lucrativos. Las pérdidas son enjugadas por dos

fondos separados y distintos. Los recursos de los principales constituyen el fondo primario y en el evento de que éste no fuere suficiente, con respecto a la fianza en cuestión, hay que acudir a los ingresos por concepto de primas y los sobrantes acumulados. Véase Crist, Jr., *Corporate Suretyship*, McGraw, Hill, 1939, págs. 1–8.

(3) Argumentando su tercer error, sostiene la recurrente que una notificación tardía, por si sola, no es suficiente para liberar a una compañía de fianzas de responsabilidad; y que, para que el incumplimiento de la obligación de notificar por escrito releve a la aseguradora de responsabilidad, es necesario que ésta demuestre que tal incumplimiento le causó daños sustanciales. Invoca los casos de *Lafontaine* v. *Municipio*, 79 D.P.R. 583 (1956) (Belaval); *Landol* v. *Colón*, 78 D.P.R. 602 (1955) (Snyder); y *Faulkner* v. *Nieves*, 76 D.P.R. 434, 440 (1954) (Marrero).

En primer lugar, queremos indicar que *en ninguno de dichos casos* se trataba de contratos de *FIANZA*, sino de contratos de *SEGURO*, consistentes en pólizas de seguro expedidas por compañías aseguradoras a favor de dueños de automóviles, para responder a terceras personas por los daños y perjuicios ocasionados a éstas, con motivo de accidentes en que estuvieran envueltos los vehículos asegurados, en los que se ocasionaran daños a los terceros, por negligencia de los conductores de dichos vehículos.

Siguiendo el orden de fecha en que fueron resueltos, la póliza de seguro expedida en el caso de *Faulkner*, supra, respondía por daños a terceras personas. Se trataba de un accidente, en el que el vehículo del asegurado Nieves chocó negligentemente el del demandante.

Entre las condiciones *de la póliza de seguro* expedida por Maryland a favor de Nieves, se incluyó una que leía así:

"6. *Notificación del Accidente.*

Cuando ocurra un accidente se dará por el asegurado o a beneficio de éste *notificación escrita* a la compañía o a cualquiera

de sus agentes autorizados *tan pronto como sea posible*. Tal notificación contendrá datos suficientes para identificar al asegurado, así como información razonablemente obtenible respecto al momento, lugar y circunstancias del accidente y nombre y dirección de los lesionados y de los testigos del caso." (Énfasis nuestro.)

En el segundo caso citado de *Landol,* supra, en que se trataba de un accidente de automóviles, *la póliza de seguro* expedida por la aseguradora P.R. & American Insurance Co., Inc., contenía una cláusula, más o menos idéntica a la del caso de *Faulkner.*

El tercer caso citado de *Lafontaine,* supra, también surgió con motivo de una colisión entre un camión de la basura del Municipio y el automóvil privado de la demandante.

En este caso también se había expedido una póliza de seguro, asegurando el vehículo de Colón contra daños ocasionados a terceras personas, por una compañía de seguros. Contenía una cláusula similar a las de los otros dos casos arriba citados.

El tribunal de instancia dictó sentencia condenando al Municipio de Río Grande a pagarle indemnización a la demandante, pero liberó a la aseguradora de su obligación de responder por el asegurado, *por haberse notificado tardíamente* el accidente ocurrido.

Este Tribunal Supremo revocó en cuanto a la liberación de la aseguradora, expresándose así:

"En ausencia de prueba que la tardanza en la notificación le causó a la compañía daños sustanciales (Faulkner v. Nieves, 76 DPR, 434 (Marrero) (1954), cita precisa a la pág. 440—por no haber colocado a la aseguradora en condiciones de practicar prontamente la investigación correspondiente y de preparar su defensa (Landol v. Colón, 78 DPR, 602 (Snyder) (1955), cita precisa a la pág. 605—es indudable que la Sala sentenciadora erró al resolver que una notificación tardía del accidente, por sí sola, era suficiente para liberar a la compañía aseguradora de responsabilidad."

Véase que en estos tres casos se trataba de tres pólizas de seguro de automóvil contra responsabilidad del asegurado a favor de terceras personas; y el requisito de notificación es *"tan pronto como sea posible"*, indeterminado e impreciso.

Una situación parecida a la que existe en este caso surgió en el caso de *Arzuaga & Santana, Inc.* v. *Ramos*, 100 D.P.R. 123 (Dávila) (1971), con la diferencia de que en ese caso se trataba de una obra pública y en el presente se trataba de una obra privada.

El Art. 1 de la Ley Núm. 388 aprobada el 9 de mayo de 1951 (22 L.P.R.A. sec. 47) establece:

> "Artículo 1. Todo contratista a quien se adjudique un contrato para la construcción, reconstrucción, ampliación, alteración o preparación de una *obra pública,* prestará una fianza de pago (*payment bond*) a favor del Pueblo de Puerto Rico, que será obligatoria y efectiva a partir de la fecha en que se formalice el contrato." (Énfasis nuestro.)

En dicho caso se trataba de una firma que suplió tres transformadores a un subcontratista de una obra pública y reclamó el valor de éstos al fiador del contratista principal. En ese caso no se cursó la notificación exigida por el Art. 5 de la Ley Núm. 388, *supra*. La suplidora demandante sostenía que la notificación era requisito previo para demandar al contratista principal pero que no lo era para demandar a la fiadora. La corte sentenciadora concurrió con ese criterio y declaró con lugar la demanda, siguiendo el precedente del caso de *García* v. *Northern Assurance Co.*, 92 D.P.R. 245 (1965) (Dávila), donde se interpretó la disposición de la Ley Municipal que requiere se notifique al Municipio de la ocurrencia de un accidente dentro de los noventa días de ocurrido; y donde se resolvió que la referida notificación se aplica únicamente para el ejercicio de la acción contra el Municipio, pero que la compañía fiadora no puede levantar como defensa la falta de notificación al Municipio.

Revocando al tribunal de instancia, este Tribunal resolvió en dicho caso de *Arzuaga,* supra:

"La situación en los casos de fianzas prestadas para garantizar el pago de los materiales utilizados en una obra pública es distinta. La ley, como hemos visto, específicamente requiere, como condición para reclamar judicialmente de la fiadora por materiales suplidos a un subcontratista, que se notifique previamente al contratista principal. Esto es así porque independientemente del hecho de que el propósito principal de la Ley Núm. 388 es garantizar el pago a los obreros y materialistas, la ley establece un procedimiento mediante el cual el contratista *tiene la oportunidad de conocer con tiempo lo adeudado por el subcontratista y así poder retener de lo que todavía le adeude por el trabajo realizado, lo suficiente para pagar a los materialistas.* Es de suma importancia por el contratista recibir esa notificación, porque distinto a las fianzas (6) por responsabilidad pública en las cuales la fiadora no puede reclamar del asegurado lo que ha tenido que pagar por daños, en el tipo de fianza que se presta para garantizar el pago a los materialistas, el fiador por ser solidario puede resarcirse reclamándole al contratista lo pagado." (Énfasis nuestro.)

Más adelante expresa este Tribunal:

". . . Las cortes federales han interpretado la disposición del Miller's Act, que como expresamos en *Jiménez y Salellas, Inc.* v. *Maryland Cas. Co.,* 92 DPR, 207 (1965) fue el modelo de la Ley Núm. 388 *en el sentido de que no procede la acción contra la fiadora si no ha mediado previamente la notificación al contratista.* [citas.] Y la realidad es que no se le está exigiendo *nada extraordinario* al suplidor de materiales. Simplemente que treinta días antes de radicar la demanda notifique al contratista lo adeudado por el subcontratista." (Énfasis nuestro.)

En el caso ante nos, no se trata de una obra pública, sino de la construcción de una obra privada para la Asociación de Maestros de Puerto Rico. Nada hay en la ley, en casos de

---

(6) Evidentemente nos referimos a las pólizas de seguro expedidas para responder de daños a terceras personas, como por ejemplo, las de seguro de automóviles, que no son fianzas, sino "seguros", ya que la primera es una figura jurídica distina a la segunda.

construcción de obras privadas, que exija la prestación de una fianza ni que exija notificación alguna dentro de un término específico, antes de iniciar acción judicial por el suplidor de los materiales. No obstante, bajo las disposiciones de lo dispuesto en los artículos números 1206 y 1207 del Código Civil, (ed. Equity, 1962) (31 L.P.R.A. secs. 3371 y 3372),[7] las partes establecieron y convinieron la cláusula (3) (a), de la fianza que se copia en la pág. 460 de esta opinión.

Legal y eficazmente, sólo notificó dentro de los noventa días a la propia deudora, la subcontratista Inter-American Builders, Inc., quien era la que le debía el importe de los materiales que le había suplido y que, por lo que surge de los autos, no tenía mucho interés en pagar dichos materiales.[8]

No notificó a la Southern Builders, Inc., la contratista principal, que era la que podía tomar las medidas razonables para remediar la situación, y que, como se expresa en *Arzuaga & Santana, Inc.*, supra, conociendo con tiempo lo adeudado por el subcontratista, podía retener de lo que todavía le adeudare por el trabajo realizado, lo suficiente para pagar al materialista, ya que la fiadora, por ser solidaria su responsabilidad, podía reclamarle a dicho contratista principal (Southern Builders, Inc.) lo pagado por la fiadora, conforme a lo dispuesto en el párrafo segundo del Art. 1721 del Código Civil de Puerto Rico, ed. 1930; (ed. Equity, 1962) (31 L.P.R.A. sec. 4871);[9] en concordancia y armonía con lo dispuesto en el Art. 1090 del Código Civil de Puerto Rico,

---

[7] Art. 1206: "El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio."

Art. 1207: "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público."

[8] Véase: Párrafo 9 de la "Estipulación de Hechos" obrante a la pág. 16 de los autos originales elevados a este Tribunal.

[9] Art. 1721. "Si el fiador se obligarse solidariamente con el deudor principal se observará lo dispuesto en el subcapítulo IV, capítulo 245 de este título."

474

ed. de 1930 (ed. Equity, 1962) (31 L.P.R.A. sec. 3101). ([10])
Este derecho no lo tiene la aseguradora en los contratos de
pólizas de seguro. Paga por la pérdida que le ocasionó su
asegurado sin poder resarcirse de éste. ([11])

Y vino a notificarle a la fiadora cuando ya había transcu-
rrido, por nueve (9) días, el término de noventa (90) días
fijados en el contrato de fianza para efectuar dicha notifica-
ción. Era muy importante en este caso notificarle a la fiadora,
dentro de dicho término, ya que no se le notificó al contratista
principal, ([12]) de que el fiado no estaba pagando sus cuentas
pues es a través de esa notificación que el fiador llega a tener
conocimiento de ese hecho; de manera que pudiera tomarse
aquellas medidas oportunas y necesarias para protegerse a
tiempo de la morosidad del fiado, antes de que su situación
económica se deteriore y se convierta en insolvente utilizando
los remedios que le conceden los Arts. 1737 y 1742 del Código
Civil de Puerto Rico, ed. 1930 (ed. Equity, 1962), 31 L.P.R.A.
secs. 4911 y 4916. ([13])

---

([10]) Art. 1090. "La concurrencia de dos o más acreedores o de dos o más
deudores es una sola obligación, no implica que cada uno de aquellos tenga
derecho a pedir ni cada uno de éstos deba prestar íntegramente las cosas
objeto de la misma.

([11]) En algunos seguros, la aseguradora adquiere el derecho de subro-
gación en relación con terceros que hayan causado el daño por su negligen-
cia, pero la aseguradora es primariamente responsable al asegurado, o
a los terceros que hubieren sufrido daños por la negligencia del asegurado,
independientemente de la responsabilidad de terceros que fueran causantes
o co-causantes del daño.

([12]) Naturalmente que en este caso, como le notificó al subcontratista,
si le hubiera notificado al contratista principal, no había obligación de
notificarle a la fiadora.

([13]) Artículo 1737. "El fiador que paga por el deudor, debe ser indemni-
zado por éste.

La indemnización comprende:

1. La cantidad total de la deuda.

2. Los intereses legales de ella desde que se haya hecho saber el pago
al deudor, aunque no lo produjese para el acreedor.

3. Los gastos ocasionados al fiador después de poner éste en conoci-
miento del deudor que ha sido requerido para el pago.

4. Los daños y perjuicios, cuando procedan.

En el volumen correspondiente al año 1969, *Proceedings,* *del American Bar Association,* sección de "Insurance, Negligence and Compensation Law" (ed. American Bar Center, Chicago, Illinois), el letrado Robert Ward, del Colegio de Abogados de Denver, Colorado, hace un estudio razonado y detallado de las disposiciones de la Ley Miller (40 U.S.C. § 270 a–e), que según expresamos en el caso de *Arzuaga,* supra, es la fuente de donde proviene nuestra Ley Núm. 388, *supra,* analizando las cuestiones relacionadas con las notificaciones. hechas y las acciones iniciadas fuera del término; y se expresa así:

". . . los casos generalmente reconocen que los requerimientos de notificación en tiempo y radicación de la acción en tiempo son condiciones a cumplirse previamente, antes de poder reclamar contra la fianza y que dicho requisito se establece para beneficio del contratista principal *y no* para beneficio del suplidor de mano de obra y/o materiales." (Traducción al español nuestra.)

▆▆▆ Y en *United States Plywood Corp.* v. *Continental Cas. Co.,* 157 A.2d 286, se dijo:

"La regla que establece que la obligación debe interpretarse en contra del asegurador y a favor de los beneficiarios de la fianza (*bond*) es una de interpretación solamente. En ausencia de ambiguedad no pueden ser invocada para desviarse (*circum-*

---

La disposición de este artículo tiene lugar aunque la fianza se haya dado ignorándolo el deudor."

Artículo 1742. "El fiador, aun antes de haber pagado, puede proceder contra el deudor principal:

1. Cuando se ve demandado judicialmente para el pago.

2. En caso de quiebra, concurso o insolvencia.

3. Cuando el deudor se ha obligado a relevarle de la fianza en un plazo determinado, y este plazo ha vencido.

4. Cuando la deuda ha llegado a hacerse exigible, por haber cumplido el plazo en que debe satisfacerse.

5. Al cabo de diez años, cuando la obligación principal no tiene término fijo para su vencimiento, a menos que sea de tal naturaleza que no puede extinguirse sino en un plazo mayor de los diez años.

En todos estos casos la acción del fiador tiende a obtener relevación de la fianza o una garantía que lo ponga a cubierto de los procedimientos del acreedor y del peligro de insolvencia en el deudor."

*vent*) del lenguaje llano y de la intención de las partes contratantes. . . . Es manifiesto del instrumento en sí que la notificación de haber dejado de pagar (*default*) *es una condición precedente al derecho de acción.* No hay ambigüedad en el lenguaje usado en el contrato y por consiguiente la aplicación de reglas de interpretación para llegar a un resultado diferente sería impropia. Las Cortes no están en libertad de ignorar el lenguaje llano y la intención de las partes contratantes. Hacer eso les requeriría el imponer responsabilidades que las partes no han convenido, o contra las cuales han contratado específicamente." (Traducción al español nuestra.)

Esta doctrina es enteramente aplicable a las fianzas prestadas en casos de obras privadas, como en el presente caso.

■ (4) En cuanto al cuarto error alegado por la recurrente, no vamos a discutirlo, porque entendemos que los razonamientos arriba expuestos disponen del mismo adversamente a la recurrente.

■ Finalizamos expresando que, a nuestro juicio, el término de noventa (90) días establecido en la fianza, para notificar, es uno de caducidad, ya que en éste se fija de antemano el tiempo *dentro del cual* debe ejercitarse el acto; y se atiende sólo al hecho objetivo de la falta de ejercicio *dentro* del término prefijado. La caducidad opera la extinción de una manera directa y automática; [14] y procede del acto jurídico privado o convenio de las partes o de la ley; distinta a la prescripción, que siempre tiene su origen en la ley. Enneccerus [15] expresa que el plazo de caducidad ha de tomarse en cuenta por el Juez, aunque sólo se desprenda su transcurso

---

[14] Nuestra opinión se limita a la responsabilidad de la fiadora recurrida bajo el contrato de fianza en cuestión. No hay duda de que el subcontratista continúa siendo responsable al materialista por la mano de obra y el importe de los materiales suplidos en la obra a que se refiere la reclamación. (En cuanto a la responsabilidad del dueño de la obra por trabajo y materiales, véase: Código Civil, 1930, Art. 1489, 31 L.P.R.A. sec. 4130).

[15] Citado por Castán Tobeñas en la obra más abajo mencionada, pág. 852.

de la exposición del demandante; la prescripción, en cambio, sólo cuando la invoque el demandado. (Véanse: Castán Tobeñas, *Derecho Civil Español, Común y Foral*, Tomo I, Vol. II, págs. 858 *et seq.*, ed. Reus, Madrid, 1963; y lo expuesto en dicha obra, a las págs. 854 y 855, sobre *El Plazo Preclusivo; Eisele* v. *Orcasitas*, 85 D.P.R. 89 (Per Curiam); y por analogía *Jiménez y Salellas, Inc.* v. *Maryland Cas. Co.*, 92 D.P.R. 207 (Rigau) (1965).)

Por los fundamentos expuestos consideramos que ninguno de los errores señalados por la recurrente fueron cometidos por el tribunal sentenciador. *Se confirma la sentencia dictada el 24 de marzo de 1972 por el Tribunal Superior, Sala de San Juan, en cuanto a la parte*[16] *de dicha sentencia aquí envuelta, en que libera a la fiadora American Surety Co. de su responsabilidad bajo la fianza.*

El Juez Asociado, Señor Díaz Cruz, concurre con el resultado, sin opinión. El Juez Asociado, Señor Irizarry Yunqué, no intervino.

---

[16] Hay otra cuestión resuelta por dicho tribunal que no está envuelta en este recurso.